## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

_____

PAUL SVINDLAND and ALLISON
SVINDLAND, as Parents and Natural
Guardians and Administrators of the
Estate of IAN SVINDLAND, a Minor
Deceased, and PAUL SVINDLAND
And ALLISON SVINDLAND,
Individually and in Their Own Right

      v.

The A.I. DuPont Hospital for Children
Of the Nemours Foundation
1600 Rockland Road
Wilmington DE  19803

      And

The Nemours Foundation
4600 Touchton Road East
Jacksonville FL  32246

      And

William I. Norwood, M.D., Ph.D.
4812 Kennett Pike
Greenville  DE  19807-1814

      And

Christian Pizarro, M.D.
C/O A.I DuPont Hospital for Children
1600 Rockland Road
Wilmington DE  19803

COMPLAINT in MEDICAL
MALPRACTICE


No. _____


JURY TRIAL DEMANDED

Russell Raphaely, M.D.
c/o A.I. DuPont Hospital for Children
1600 Rockland Road
Wilmington DE  19803

     And

Paul Kerins, Perfusionist
c/o A.I. DuPont Hospital for Children
1600 Rockland Road
Wilmington DE  19803

## COMPLAINT

### JURISDICTION

1.    Jurisdiction is vested in this Court by virtue of federal questions arising under and pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §701 et seq., as well as 28 U.S.C. § 1331.

### PARTIES

2.    Plaintiffs are Paul Svindland and Allison Svindland, as the parents and natural guardians and administrators of the Estate of Ian Svindland, deceased.  The Svindlands reside at 521 Country Club Drive, Wilmington, DE  19803. Plaintiffs' decedent, Ian Svindland (hereinafter sometimes referred to as "Ian") was born on May 16, 2003 and died on July 14, 2003.

3.    Defendant DuPont Hospital (hereinafter "DuPont Hospital" or "the Hospital") is a hospital licensed to operate in the State of Delaware with a physical location at 1600 Rockland Road, Wilmington Delaware.

4.    Defendant Nemours Foundation, upon information and belief is a corporation and charitable foundation authorized to operate in Florida, Delaware and

Pennsylvania, among other states, and owns the DuPont Hospital.  Upon information and belief, Nemours Foundation also owns several physicians practices in Pennsylvania, Delaware, New Jersey, Florida and other states, and maintains offices for those physicians in those states. The headquarters of Nemours Foundation is in the State of Florida.

5.      Defendant William I. Norwood, M.D., Ph.D. is a physician and surgeon licensed to practice medicine in Delaware, Florida, Pennsylvania and New Jersey, with a current address of 4812 Kennett Pike, Greenville DE 19807.  At all times material hereto, Dr. Norwood was chief of cardiothoracic surgery at the Nemours Cardiac Center of the DuPont Hospital, a member of its staff, and was the primary surgeon who operated on the minor Plaintiff herein. At all times material hereto he was employed by, and/or was the agent and/or ostensible agent of the DuPont Hospital and/or the Nemours Foundation.

6.      Defendant, Christian Pizarro, M.D. is a physician and surgeon licensed to practice medicine in Delaware, Florida and Pennsylvania.  At all times material hereto, Dr. Pizarro was a member of the staff of DuPont Hospital, and was a cardiothoracic surgeon at that facility.  He was one of the surgeons who operated on Ian.  At all times material hereto he was employed by, and/or was the agent and/or ostensible agent of the DuPont Hospital and/or the Nemours Foundation.

7.      Defendant Russell A. Raphaely, M.D. is a physician and anesthesiologist with a subspecialty in pediatric cardiac anesthesia and critical care medicine.  At all times material hereto he was employed by, and/or was the agent and/or

3

ostensible agent of DuPont Hospital and/or the Nemours Foundation, and was a staff member of the DuPont Hospital. Dr. Raphaely maintains a place of business at 1600 Rockland Road, Wilmington, DE 19807.

8.    Defendant, Paul Kerins, is an individual working in the field of cardiopulmonary perfusion who, at all times material hereto, was a perfusionist who was employed by, or was the agent or ostensible agent of the DuPont Hospital and/or the Nemours Foundation. Upon information and belief, Paul Kerins maintains a place of business at 1600 Rockland Road, Wilmington, DE 19807.

### FACTS APPLICABLE TO ALL COUNTS

9.    Ian Svindland was born on 5/16/03. He was diagnosed before birth with a Ventricular Septal Defect (VSD) which is a hole which allows blood to flow back and forth between the right and left ventricles of the heart.

10.    Shortly after birth, Ian was admitted to DuPont Hospital for observation relative to his heart defect. At this time, DuPont Hospital and its agents diagnosed the following with regard to Ian's heart: a large conoventricular-type VSD, a large Patent Ductus Arteriosus (PDA) with bi-directional flow, and a Patent Foramen Ovale (PFO).

11.    Ian was monitored for a few days and discharged. Surgery was planned for several weeks thereafter.

12.    Ian returned for scheduled follow-up appointments as directed and was admitted to DuPont on June 24, 2003 for surgery on June 25, 2003.

13.     On June 25, 2003, Ian underwent surgery performed by Dr. Norwood and assisted by Dr. Pizarro.  In his operative note, Dr. Norwood states that the procedure performed was closure of the VSD and PFO.

14.     Prior to the actual surgery, but under Dr. Norwood's direction, Ian was placed on cardiopulmonary bypass.  After being placed on bypass, Ian was cooled to 20.4 degrees centigrade in 6 minutes. His circulation (meaning all flow of blood in his body) was completely stopped for 33 minutes.

15.     The anesthesiologist was Russell Raphaely, M.D.  He recorded on the anesthesia record the temperatures and times relative to Ian's cooling and bypass, as well as his vital signs and medications, among other information. He also cared for Ian in the cardiac intensive care unit (CICU) and communicated with the family.

16.     The perfusionist (the person who runs the bypass machine) for the procedure was an individual identified as P. Kerins on the perfusion record for that surgery.  Upon information and belief, Plaintiffs believe that this individual is the defendant, Paul Kerins.

17.     After the procedure, a handwritten brief operative note was entered in the chart by Dr. Pizarro which indicates that there was a closure of the VSD and suture closure of a PFO.

18.     Neither Dr. Norwood's nor Dr. Pizarro's operative reports for June 25, 2003, indicate that Ian's ductus arteriosus was surgically closed.

19.     Soon after surgery, Ian decompensated and required larger doses of medications to maintain his blood pressure.

20.     Shortly thereafter, Ian deteriorated again and required increased mechanical
        ventilatory support and had to be placed on Extracorporeal Membrane
        Oxygenation (ECMO).  The chart indicates that this was an attempt to give his
        heart a rest since it had severely decreased function.

21.     Ian suffered from seizures following surgery.

22.     Ian continued to deteriorate and soon developed multisystem organ
        dysfunction which included damage to his kidneys, liver, bowels and lungs.

23.     On June 30, 2003, Ian underwent a cardiac catheterization.  Immediately after
        this procedure and in the cath lab, Dr. Pizarro opened Ian's chest to close his
        patent ductus arteriosus (PDA) which was left open during the first surgery on
        June 25, 2003.

24.     Ian required the insertion of a pacemaker on July 4, 2004.  On the same date a
        peritoneal dialysis catheter was inserted because Ian's kidneys were not
        working.  On the same day, he was removed from ECMO.

25.     Prior to this date, Dr. Pizarro advised Mr. And Mrs. Svindland that Ian would
        need a heart transplant and Ian was listed for transplant.

26.     On July 14, 2003, Ian died.

27.     At all times material hereto, Ian Svindland was treated at the Nemours
        Cardiac Center operated by and located within the walls of the DuPont
        Hospital.  Upon information and belief, the Nemours Cardiac Center ("the
        Cardiac Center") was run by Dr. Norwood as chief of the practice and director
        of the Cardiac Center, with the blessing and oversight of DuPont Hospital.

The Cardiac Center was a part of DuPont Hospital (it occupied a wing of the second floor) as well as the Nemours Foundation itself.

28.     In fact, the Nemours Foundation specifically chose Dr. Norwood to lead and operate the Cardiac Center, which opened in Delaware in 1998.

29.     At all times material hereto, DuPont Hospital maintained a business venture with Thomas Jefferson University Hospital ("Jefferson"). As part of this relationship, residents from Jefferson rotate through certain specialties at DuPont Hospital, and pediatricians at Jefferson are employed by DuPont Hospital.

30.     In addition, most staff cardiologists at DuPont Hospital maintained professional offices at Jefferson, or in one of Jefferson's many offices for the purpose of seeing patients, and regularly saw patients at those offices.  In addition, Dr. Norwood and Dr. Pizarro, the cardiac surgeons at DuPont, maintained offices at Jefferson, and regularly saw patients at those offices.

31.     In addition, DuPont cardiologists and pediatricians maintained offices at Bryn Mawr Hospital, and/or Main Line Health owned and operated offices for the purposes of seeing patients.  Main Line Health is owned and operated by the Thomas Jefferson University Health System.

32.     Practices involving nearly every pediatric specialty are served through "DuPont at Jefferson" practices.  These practices include pediatric cardiology and are located at 841 Chestnut Street in Philadelphia, Pennsylvania.

33.    DuPont Hospital maintains an overt clinical and business relationship with Jefferson and Main Line Health, as evidenced by the sign for DuPont Hospital which proclaims its partnership with Jefferson.

34.    The Chief of the Practice of DuPont at Jefferson maintains an office both at Jefferson and at DuPont Hospital.

35.    Dr. Norwood was a professor of surgery at Thomas Jefferson University Health System at all times material hereto.

36.    Dr. Pizarro was a professor of surgery at Thomas Jefferson University Health System at all times material hereto.

37.    Dr. Raphaely was a professor of anesthesia and critical care medicine at Thomas Jefferson University Health System at all times material hereto.  He was also chief of anesthesia at the Cardiac Center.

38.    Affidavits of merit as to all professional defendants, against whom medical negligence is alleged, are NOT attached hereto but are filed with the Court in a sealed envelope as Exhibit "A".


**COUNT I – FRAUD & CONSPIRACY**

**PLAINTIFFS V. DUPONT HOSPITAL, THE NEMOURS FOUNDATION and**

**WILLIAM I. NORWOOD, M.D., CHRISTIAN PIZARRO, M.D., RUSSELL**

**RAPHAELY, M.D. and PAUL KERINS**

39.    Paragraphs 1 through 38 are hereby incorporated by reference as though each were fully set forth at length herein.

40.     The pump sheet contains purported arterial blood gas results which do not appear in the comprehensive laboratory printout.  Nor do they appear anywhere else in the chart.  For example, the anesthesia record indicates sinus tachycardia as the cardiac rhythm at 8:00 a.m.  A lab report for lactic acid was reported at 8:30 a.m. to have been called to the floor.  Lactic acid is only drawn if there is an indication to do so, and the indication to do so would come from a blood gas indicating an acidemia.  However, there is no blood gas recorded anywhere in the chart which would indicate why a test was done for lactic acid.  There is no laboratory record, no anesthesia record and no perfusion sheet record of any blood gas drawn before 8:29 a.m.

41.     In addition, there are other blood gas results which appear on the perfusion record, but not on the comprehensive laboratory printout.  There are no blood gas results on the anesthesia record.

42.     In fact, in this case, the perfusion record was not provided to the Svindlands despite the fact that they requested the entire medical record pertaining to their son.  The perfusion sheet was not provided until counsel requested it specifically, by name.  This very pump sheet contains misleading information which was designed to deceive (see paragraph 41, above).

43.     The Svindlands were specifically told by Dr. Norwood that Ian's was a simple procedure, that he did them all the time and that everything would be fine.  In fact, the Svindlands were given every reason by Dr. Norwood that this was a simple procedure which carried little risk.

44.     Dr. Norwood dictated and signed the operative report which purportedly

        describes the surgical procedures which were performed.

45.     The Svindlands met with Dr. Norwood nearly every day that Ian was in the

        hospital and at no time did Dr. Norwood tell them that there was a problem

        with Ian's surgery, or that he had failed to close the ductus.  In fact, he

        continued to tell the Svindlands that Ian would be fine, despite his seriously

        declining condition and his failing organs.

46.     Dr. Norwood, Dr. Pizarro, Dr. Raphaely and the staff cardiologists were aware

        that Ian's ductus remained open, and they knew that this was not supposed to

        be.  Dr. Gina Baffa specifically told the Svindlands that "they [Dr. Norwood

        and Dr. Pizarro] always put a clip on that [the ductus]."

47.     However, a clip was not put on the ductus during this surgery and it was left

        open.  Despite the fact that Dr. Norwood, Dr. Pizarro, Dr. Raphaely, Dr. Baffa

        and other staff members knew that Ian's ductus remained open, no one took

        any steps to do anything about this for five days, when on June 30th, Ian's

        chest was "explored" in the cath lab and the ductus was closed with suture.

48.     The parents were never told that this had occurred and, in fact, had been

        specifically told by Dr. Baffa that the ductus had closed on its own.

49.     In addition, after the cardiac catheterization on June 30th, Dr. Pizarro and/or

        Dr. Neghme told the Svindlands that he had put a clip on the ductus "just in

        case".  Mr. And Mrs. Svindland had no reason to question this because they

        relied on what they were being told by the surgeons and staff of the Cardiac

        Center as to Ian's condition and the reasons for that condition.

50.     In fact, throughout the time Ian was in the hospital, Dr. Norwood specifically told the Svindlands that he had no idea why Ian was responding "this way."

51.     There is no question that the defendants and the other staff of the Cardiac Center were aware that Ian's ductus had not been closed during the surgery on June 25th.  The nursing notes indicate that a post-operative echocardiogram was performed on the 25th.  There is no report for this echocardiogram in the chart.  However, the echo itself shows flow through the ductus arteriosus.  Therefore, the defendants and staff knew of the problem, yet continued to tell the parents that nothing was wrong and that the ductus was, in fact, closed.

52.     Specifically, Dr. Gina Baffa and Dr. Norwood told the parents that the ductus was closed.

53.     At no time were the parents told that Ian's ductus had not in fact closed on its own but had been left open by Dr. Norwood which contributed to his condition and death.  On the contrary, this information was specifically kept from the Svindlands.  Had the Svindlands known about this, they would have transferred Ian to another facility for proper treatment.

54.     Despite the fact that at all times material hereto, the Defendants knew that the cooling procedures and techniques used for bypass and circulatory arrest and the surgery were unproven and likely to be harmful, the parents were not told.  In fact, they were purposefully misled by Dr. Norwood, Dr. Pizarro and Dr. Raphaely and the Hospital and Foundation into believing that their practices were state of the art.  The Hospital's website touted the Cardiac Center's

11

approach and techniques and the skill and experience of its staff, including Dr. Norwood, Dr. Pizarro, Dr. Raphaely, and other staff.

55.    It is believed, and therefore averred, that the defendants, Dr. Raphaely and Dr. Pizarro, conspired with Dr. Norwood, the perfusionists and others to conceal from the plaintiffs the true nature of the perfusion process/strategy, cardiopulmonary bypass and circulatory arrest.  None of these individuals revealed to Plaintiffs the fact that Ian's cooling and circulatory arrest were inadequate, harmful, and below the standard of care.

56.    At no time were Mr. And Mrs. Svindland ever informed that Ian's cardiopulmonary bypass and cooling procedures were inadequate and harmful.  Instead, Dr. Raphaely, who is also a critical care physician and cared for Ian in the ICU, continually told the parents that he did not know what was causing the problems with Ian. Dr. Norwood did not tell Mr. And Mrs. Svindland why Ian was deteriorating, despite the fact that, given the cooling and perfusion, and surgical technique he used on Ian, he knew at the time what the problem was.  Dr. Raphaely likewise failed to tell the parents the cause of Ian's problems despite the fact that he had seen this type of outcome before.

57.    The blood gas readings on the perfusion record do not all appear on the comprehensive laboratory printout.  The I-STAT machines (portable blood gas analyzers) used to measure arterial blood gases in the operating room are designed to have their data uploaded to a central repository via a docking station.  This uploading occurs every evening.  The central repository is

medical records which then prints out the results and purportedly makes them part of the medical record.  Either Paul Kerins, Dr. Raphaely, or Dr. Norwood, or Dr. Pizarro, or someone acting on their behalf or on behalf of each other, purposefully failed to upload these blood gas results to the laboratory database.  The failure to upload blood gas results run on any I-STAT machine in use in 2003 required an overt act so that there would be no recordable transfer to the lab and therefore no record of a bad blood gas.  There is no other manner in which an operator of an I-STAT machine can change a value.

58.     The same practice of not uploading blood gas results was followed for many other children as well so that these records are also missing blood gas results. Plaintiffs are in possession of these records.

59.     Under the specific direction of Dr. Norwood and Dr. Raphaely, no overt references to seizure activity, infection and/or other complications were permitted to be made in the medical charts in order to prevent plaintiffs from discovering any problems with the care of children at the cardiac center, thereby causing any reader of the chart entries to conclude that no seizures, or other complications occurred when, indeed, they did occur.

60.     Ian did, in fact, have seizures post-operatively, but this fact was purposefully obfuscated pursuant to the direction of Drs. Norwood and Raphaely, as aforesaid, for the purpose of avoiding liability by misleading parents.  In fact, Mr. And Mrs. Svindland were unaware of Ian's condition in this regard until the records were examined for obfuscation of seizure activity.

61.  The staff at the Cardiac Center, under the specific direction of Dr. Norwood and Dr. Raphaely, were told that there were to be no consultations with medical specialties outside the Cardiac Center.  There were to be no "outsiders" permitted into the Cardiac Center who would presumably accurately record any complications for which they were being consulted.

62.  Dr. Norwood knew at the time that he performed surgery on Ian that cooling a patient for less than 20 minutes in preparation for circulatory arrest was in direct contravention of the substantial body of medical literature on the subject which required cooling to take place for no less than 20 minutes, and was known at the time to be harmful.

63.  It is the surgeon's job to know at all times what are the various measured temperatures of the patient during cooling. This is known to be Dr. Norwood's practice.  It is also the surgeon's duty to cool appropriately and homogeneously and to know how long the patient has been cooled.

64.  Furthermore, the Delaware Department of Health, Facilities Management Division, (which is an agent for the U.S. Department of Health and Human Services) has found the following long-standing deficiencies in the cardiopulmonary bypass and circulatory arrest procedures of the hospital:

a.       Failure to have any policies at all related to perfusion, cardiopulmonary bypass and/or circulatory arrest.

b.       Failure to require that such policies be made and followed.

65.  The defendants, Dr. Norwood, Dr. Raphaely, Dr. Pizarro and Mr. Kerins, knew at the time that Ian was treated that the cooling/perfusion processes

which were being used were inadequate, harmful and negligent and they undertook a course of action to hide this from the plaintiffs through overt actions (e.g., stating to Mr. And Mrs. Svindland that they had no idea what was wrong with Ian, when in fact, they knew exactly what was wrong with Ian and how it happened) as well as failing to tell plaintiffs what they had done, and falsifying the medical chart to back it up, (e.g., failing to properly report and record blood gases).

66.     DuPont Hospital, as well as the Nemours Foundation itself, were aware of the cooling and bypass practices of Dr. Norwood long before he was hired.  At the time that Dr. Norwood was recruited by the Foundation and hired to run its cardiac centers in Wilmington and Florida, all hospitals were required under the Health Care Quality Improvement Act to make an investigation into the background of each physician whom they wanted to credential.  This included a requirement that upon application for privileges, as well as *every two years*, letters be sent to all hospitals or facilities where the physician held privileges, no matter the location or duration of time, and it also included a requirement that upon application for privileges as well as every two years, the hospital inquire formally to the National Practitioner Databank to learn of any lawsuits which had been brought, whether settled or tried to verdict against the physician applying for privileges.  If DuPont Hospital and/or the Nemours Foundation had done as required, they would have known about Dr. Norwood's practices, which had not changed since he was a fellow at Boston Children's Hospital.

67.     An "investigation" into Dr. Norwood's lawsuits and conduct was conducted

by a representative of the Nemours Foundation who was an old friend of Dr.

Norwood's.  This "investigation" purportedly turned up nothing.  However,

the Foundation was, in fact, put on notice that there were problems with Dr.

Norwood's lawsuits and conduct.

68.     Furthermore, the Hospital and the Foundation were specifically informed,

prior to 2003, of the problems with Dr. Norwood's practices and chose to

dismiss them instead of properly investigating them.

69.     At no time, and in no manner, did anyone from the Hospital or the Foundation

or Dr. Norwood, Dr. Raphaely or Dr. Pizarro, communicate with Mr. And

Mrs. Svindland or anyone acting on their behalf, to inform them that the

cardiopulmonary bypass, circulatory arrest, perfusion and surgical procedures

had been below the standard of care/negligent.  This is a direct violation of the

duty a hospital, and physicians, owe to their patients to inform them of exactly

the nature of their conditions and the manner in which their care was carried

out.

70.     In addition to preventing the Svindlands from knowing the true cause of their

son's illness and death, this and other actions and inactions of the hospital,

foundation, Dr. Norwood, Dr. Raphaely, Dr. Pizarro and Mr. Kerins

constituted fraud in the inducement such that Mr. And Mrs. Svindland never

would have consented to the procedures had they known.  Nor, would they

have allowed their son to stay at a facility and under the care of these

defendants.

71.    In fact, not only did no one at the Hospital or the Foundation, or Dr. Norwood tell Mr. And Mrs. Svindland about their son's terrible predicament and medical condition, they overtly chose to fail to tell them that they – Dr. Norwood, Dr. Pizarro, Dr. Raphaely, Mr. Kerins and the Hospital and Foundation – caused their son's condition and his death.  This was done in order to conceal their own negligence, and to prevent the plaintiffs' discovery of their claim and/or to ensure that the conspiracy was of such a nature as to be self-concealing.

72.    Despite the fact that the parents had gotten complete records soon after Ian's death, they did not receive the pump sheet which contains the arterial blood gases not reported/uploaded to the lab.  The pump sheets are not kept with the patient's chart and are not a part of it (or are not produced despite being part of it).  Unless the pump sheet (perfusion record) is specifically requested by name, it is routinely not produced by the hospital in response to a request for the "entire chart" no matter whether that chart is requested by an attorney or a parent.

73.    With regard to the cooling/perfusion/bypass/circulatory arrest procedures and methods, at the time Dr. Norwood operated on Ian Svindland he was aware of the standard of care for cooling, which was to cool over a period of at least 20 minutes on bypass.  Yet, he chose to disregard this standard in favor of his own "standard", despite the knowledge of the damage this could cause.

74.    Dr. Norwood and A.I. DuPont Hospital and the Nemours Foundation held themselves out to be masters of cardiac surgery and patient care in that regard,

the best of the best.  This "holding out" induced the plaintiffs to seek care from Dr. Norwood and the Hospital and Foundation.

75.  Dr. Norwood held himself out to be one of the best congenital heart surgeons in the world.  The Hospital and Foundation held him out in the same manner in advertisements and in their annual reports.  In fact, the Hospital and/or Foundation and Dr. Norwood claimed results on par with all other major congenital heart centers

76.  In fact, the mortality rate of the Nemours Cardiac Center under the direction of Dr. Norwood and owned and operated by the Hospital and Foundation was more than 12 percent.  This was never conveyed to parents, and certainly not to Mr. And Mrs. Svindland.

77.  Mr. And Mrs. Svindland  relied upon the statements, and lack of statements from Dr. Norwood, Dr. Pizarro, and the anesthesiologists as well as other hospital personnel and health care providers employed by the Hospital and/or Foundation that they had no idea why Ian was so sick. They relied on this because they trusted them.  They violated their trust by causing the death of their son with the methods and manner by which they chose to use to care for him, and then by covering it up.  By failing to inform the Svindlands about the procedures routinely followed with regard to Cardiac Surgery and cooling/perfusion/circulatory arrest, they deprived them of the opportunity to transfer Ian to a facility which could competently care for their son and which had staff which was competent to perform cardiac surgery in a manner consistent with the standard of care.

78.     The Hospital and the Foundation also chose not to act on their knowledge of Dr. Norwood's impairment and took no steps to prevent this from affecting patient care, including the care of Ian Svindland.

79.     Dr. Norwood intentionally disregarded his duty of care to disclose risks a reasonable and prudent person would want to know in advance of surgery and treatment in order to decide whether to proceed.  He also intentionally disregarded his duty of care to Ian Svindland and his parents by failing to inform them of Ian's true condition and its cause.  Mr. And Mrs. Svindland never questioned what happened to their son because Dr. Norwood, the Hospital and the Foundation held Dr. Norwood out to be the best there is.

80.     Dr. Raphaely and Dr. Pizarro intentionally disregarded their duty of care to Ian and his parents by failing to inform them of Ian's true condition and its cause, and by intentionally failing, or conspiring with others, as aforesaid, to fail to report blood gas results drawn in the operating room to the lab and/or falsifying same in order to make it look like Ian was in better shape than he was.

81.     Mr. Kerins intentionally disregarded his duty of care to Ian and his parents by failing, or conspiring to fail, to report blood gas results drawn in the operating room to the lab and/or falsifying same in order to make it look like Ian was in better shape than he was.

82.     Dr. Raphaely and Dr. Norwood intentionally disregarded their duty to Ian and his parents by preventing any staff from making an accurate and truthful medical record which prevented Ian  and others like him from getting the care

they required.  It also prevented the Svindlands from knowing that anything untoward had happened to Ian.

83.    The Hospital and the Foundation knew well before the time Ian was treated that Dr. Norwood did not attend medical staff meetings and that cardiac cases were not presented to the Medical Review Committee.  The hospital was aware of the deaths but there was no quality review in an attempt to obfuscate the true nature of the deaths.  The Hospital was charged with physician and procedure oversight and they knew before Ian was treated, and at the time he was treated, that Dr. Norwood was reckless and that the cardiac center was out of control and they did nothing in an attempt to 1) continue to entice patients to come to the cardiac center for treatment and 2) prevent others who had been treated there from discovering the true set-up and mortality rates at the center. The administrative staff at the hospital and the Foundation were active in obfuscating what was going on at the Cardiac Center.  The Hospital administrators were specifically told by employees well before Ian Svindland was treated that there were severe, serious and life-threatening problems at the Cardiac Center and they failed to act.

84.    The acts and omissions of defendants described herein plainly constitute a scheme or artifice reasonably calculated to deceive persons of ordinary prudence and comprehension.

85.    As a result of their reckless, wanton and willful and negligent behavior of these defendants, Plaintiffs, Paul and Allison Svindland and their son, Ian Svindland, were injured and suffered grievous injury and death.  The

aaaaaa

Svindlands suffered the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son, Ian, during the remainder of his natural life.  In addition, Mr. And Mrs. Svindland have incurred expenses associated with the surgeries and cardiopulmonary bypass and subsequent management of Ian.  Ian lost his life, but not before suffering terribly, and he lost the ability to enjoy his natural life and earn a living.  In addition, the Plaintiffs incurred the cost of the hospitalization and burial.

WHEREFORE, Plaintiffs demand judgment against Defendants, DuPont Hospital, the Nemours Foundation, and Dr. William Norwood, Dr. Christian Pizarro and Dr. Russell Raphaely, for compensatory damages, including attorney's fees and costs, as well as punitive damages in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## COUNT II – WRONGFUL DEATH

## PLAINTIFFS V. THE DUPONT HOSPITAL

## and THE NEMOURS FOUNDATION

## NEGLIGENT SUPERVISION, MONITORING, AND RETENTION OF HEALTH CARE PROVIDERS

86.     Paragraphs 1 through 85 are hereby incorporated by reference as though each were fully set forth herein.

87.     Plaintiffs bring this action in accordance with the Delaware Wrongful Death Statute and its provisions.

88.     All the medical professional defendants named herein, perfusionists, and the nurses, advanced practice nurses, physician assistants and technicians at DuPont Hospital who cared for and were responsible for the treatment of plaintiff Ian Svindland, were the duly appointed agents, ostensible agents, servants and/or employees of DuPont Hospital , were acting within the scope of their agency and/or employment,  and  either worked in, operated out of, and/or had privileges at DuPont's facilities.

89.     Defendants DuPont Hospital and the Nemours Foundation had a duty under the law of corporate negligence to ensure the safety of Ian Svindland while he was a patient within the walls of DuPont Hospital.

90.     DuPont Hospital and the Nemours Foundation had a duty under the corporate negligence doctrine to ensure, among other duties,  that all persons practicing medicine within its walls who attended to the care and treatment of Ian Svindland complied with the prevailing standard of care in their care and treatment of Ian.

91.     Under Delaware law, the Hospital had a duty to protect patients from dangers flowing from negligent care by

        a.      assuring that only competent staff were granted privileges;

        b.      that only competent staff retained privileges;

        c.      that rules and regulations for patient safety were in effect and followed; and

        d.      that medical care provided within the walls of the hospital was adequately monitored.

92.     DuPont Hospital and the Nemours Foundation itself, carelessly and

        negligently breached its duty to Ian Svindland by failing to conform to the

        standard of care required of a hospital acting in the same or similar

        circumstances.

93.     DuPont Hospital and the Nemours Foundation failed to act on their

        knowledge of the impairment of the chief of cardiothoracic surgery, Dr.

        William Norwood, both before and after he was hired.

94.     DuPont Hospital and the Nemours Foundation failed to remove William

        Norwood, M.D. from the active practice of surgery at the Hospital as a result

        of his impairment, as well as for his failure to follow accepted standards of

        care on a regular, habitual and continual basis.

95.     DuPont Hospital and the Nemours Foundation hired and retained others who

        helped to cover up Dr. Norwood's impairment and negligence, with the

        knowledge of DuPont Hospital and Nemours Foundation.

96.     DuPont Hospital and the Nemours Foundation failed to require that all

        persons making notes in the chart actually enter truthful and accurate notes.

97.     DuPont Hospital and the Nemours Foundation failed to take steps to assure

        that all federal regulations with regard to patient care were being followed by

        the Cardiac Center and the named defendants herein.

98.     By reason of, and as a result of the aforesaid incidents, and the negligence and

        carelessness as well as the reckless, willful and wanton conduct of defendants,

        DuPont Hospital and the Nemours Foundation, their employees, servants,

        agents, and/or ostensible agents, Ian Svindland's surgery, his perfusion and

cardiopulmonary bypass, including circulatory arrest, as well as his medical and subsequent surgical care were improperly managed, resulting in the preventable pain and suffering and death of baby Ian Svindland.

99.   By reason of and as a result of the aforesaid carelessness and/or negligence as well as the reckless, wanton and willful conduct of defendants, DuPont Hospital and the Nemours Foundation, their employees, servants, agents, and/or ostensible agents, acting by and through their employees, servants, agents, and/or ostensible agents, Paul and Allison Svindland suffered the loss of their child.

100.  As a further result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct, of DuPont Hospital and the Nemours Foundation, their employees, servants, agents, and/or ostensible agents, resulting in the death of baby, Ian Svindland, Paul and Allison Svindland suffered mental anguish and the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son Ian Svindland, during the remainder of his natural life. In addition, the Svindlands have incurred expenses associated with the surgeries and cardiopulmonary bypass and subsequent management of Ian Svindland.

101.  In addition, as a result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct of defendant, DuPont Hospital and the Nemours Foundation, their employees, servants, agents, and/or ostensible agents, directly resulting in the untimely death of baby Ian Svindland, Paul

Svindland and Allison Svindland suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

WHEREFORE, plaintiffs Allison Svindland and Paul Svindland individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendants DuPont Hospital, the Nemours Foundation, William I. Norwood, M.D., Russell Raphaely, M.D., Christian Pizarro, M.D. and Paul Kerins, jointly and severally, for compensatory and consequential damages and costs in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## COUNT III – WRONGFUL DEATH

## PLAINTIFFS V. WILLIAM I. NORWOOD, M.D. &

## CHRISTIAN PIZARRO, M.D.

## NEGLIGENCE

102.    Paragraphs 1 through 101 are hereby incorporated by reference as though each were fully set forth herein.

103.    Plaintiffs bring this action in accordance with the Delaware Wrongful Death Statute and its provisions.

104.    At all times material hereto, Dr. Norwood and Dr. Pizarro were employed by and/or was the agent and/or ostensible agent of the DuPont Hospital, as well as the Nemours Foundation, as a physician and cardiothoracic surgeon.  He was chief and director of the Nemours Cardiac Center of DuPont Hospital.

105.    At all times material hereto, Dr. Norwood was an impaired physician who should not have been performing surgery.

106.    Upon information and belief, Dr. Norwood was not able to effectively and properly perform surgery because he was impaired.

107.    At all times material hereto, Dr. Norwood employed a "cooling strategy" on cardiopulmonary bypass and for circulatory arrest which was below the standard of care.  At all times material hereto, Dr. Pizarro either partially directed this process or took part in this process.

108.    In addition, Dr. Norwood failed to meet the standard of care with regard to Ian's surgery on June 25, 2003 by failing to perform the appropriate surgery, and failing to perform the surgery which was done in a competent and proper manner.

109.    Dr. Pizarro failed to meet the standard of care with regard to Ian's surgery on June 25, 2003 by failing to perform the appropriate surgery, and failing to perform the surgery which was done in a competent and proper manner.

110.    In addition, Dr. Norwood and/or Dr. Pizarro failed to ligate Ian's patent ductus arteriosus.

111.    At the time that Dr. Norwood and Dr. Pizarro performed the surgeries on Ian Svindland, including directing the cooling process, they were well aware that his "cooling strategy" was dangerous and did not offer adequate protection to the brain and other organs of the body, and that it entailed a great risk to the patient's well-being.

112.   By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, Dr. Norwood and Dr. Pizarro, Ian Svindland's surgery, his perfusion and cardiopulmonary bypass, including circulatory arrest, as well as his medical and subsequent surgical care were improperly managed, resulting in the preventable pain and suffering and death of baby Ian Svindland.

113.   By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, Dr. Norwood and Dr. Pizarro, Paul and Allison Svindland suffered the loss of their child.

114.   As a further result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct, of defendants, Dr. Norwood and Dr. Pizarro, resulting in and contributing to the death of baby Ian Svindland, Paul and Allison Svindland suffered mental anguish and the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son Ian Svindland, during the remainder of his natural life.  In addition, the Svindlands have incurred expenses associated with the surgeries and cardiopulmonary bypass and subsequent management of Ian Svindland.

115.   By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, Dr. Norwood and Dr. Pizarro, directly resulting in and contributing to the untimely death of baby Ian Svindland, Mr. And Mrs. Svindland suffered

severe emotional distress, and serious injuries to their nerves and other parts
of their bodies.

WHEREFORE, plaintiffs Paul Svindland and Allison Svindland, individually,
and as Administrators of the Estate of baby Ian Svindland, demand judgment in their
favor and against defendant, William I. Norwood, M.D., Ph.D. and Christian Pizarro,
M.D., jointly and severally with the other named defendants for compensatory and
consequential damages and in an amount in excess of One Hundred Fifty Thousand
Dollars ($150,000.00).

## COUNT IV – WRONGFUL DEATH

## PLAINTIFFS V. WILLIAM NORWOOD, M.D., PhD.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

116.    Paragraphs 1 through 114 are hereby incorporated by reference as though each
were fully set forth herein.

117.    Due to all of the aforementioned facts and allegations, Mr. And Mrs.
Svindland suffered emotionally from the care Ian  received at the Hospital
under the care of the defendants which caused them to require medical
treatment.

118.    Mr. And Mrs. Svindland had no reason to believe until they obtained Ian's
medical records and had them reviewed, that Ian had died at the hands of the
Defendant, William Norwood, among others.  They were not told the true
reason for Ian's death, but were purposefully misled by Dr. Norwood and
others into believing that Ian was "very sick" and that his condition was "one

of those things." The distress caused by this information and the knowledge that the true nature of Ian's condition was overtly kept from them caused them severe emotional distress which has manifested itself in physical ailments.

119.    In addition, by reason of, and as a result of the aforesaid incidents, and the negligence and  carelessness as well as the reckless, willful and wanton conduct of defendant, Dr. Norwood, directly resulting in and contributing to the untimely death of baby Ian Svindland, Mr. And Mrs. Svindland suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

120.    Mr. And Mrs. Svindland have suffered long-continuing physical manifestations of this emotional distress.

WHEREFORE, plaintiffs Paul Svindland and Allison Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendants, William I. Norwood, M.D., Ph.D., jointly and severally with the other named defendants for compensatory and consequential damages and costs in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## COUNT V – WRONGFUL DEATH

## PLAINTIFFS V. PAUL KERINS, PERFUSIONIST

## NEGLIGENCE

121.    Paragraphs 1 through 120 are hereby incorporated by reference as though each were fully set forth at length herein.

122.    Plaintiffs bring this action in accordance with the Delaware Wrongful Death Statute and its provisions.

123.   At all times material hereto, Paul Kerins was an employee and/or agent and/or ostensible agent of the DuPont Hospital, as well as the Nemours Foundation, as a perfusionist in the Department of Cardiac Anesthesia of the Nemours Cardiac Center of DuPont Hospital.

124.   At all times material hereto, Mr. Kerins employed a "cooling strategy" on cardiopulmonary bypass and for circulatory arrest which was well below the standard of care.

125.   At the time that the surgeries were performed on Ian Svindland, Mr. Kerins was well aware that the "cooling strategy" was dangerous and did not offer adequate protection to the brain and other organs of the body, and that it entailed a great risk to the patient's well-being.

126.   By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendant, Paul Kerins, Ian Svindland's perfusion and cardiopulmonary bypass, including circulatory arrest, were improperly managed and implemented, resulting in the preventable pain and suffering and death of baby Ian Svindland and causing mental anguish and suffering to his parents.

127.   By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendant, Paul Kerins, Mr. And Mrs. Svindland suffered the loss of their child.

128.   As a further result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct, of defendant, Paul Kerins, resulting in and contributing to the death of baby, Ian Svindland, Mr. And Mrs. Svindland

suffered mental anguish and the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son Ian Svindland, during the remainder of his natural life. In addition, Mr. And Mrs. Svindland have incurred expenses associated with the surgeries and cardiopulmonary bypass and subsequent management of Ian Svindland.

129.    In addition, by reason of, and as a result of the aforesaid incidents, and the negligence and  carelessness as well as the reckless, willful and wanton conduct of defendant, Paul Kerins, directly resulting in and contributing to the untimely death of baby Ian Svindland, Mr. And Mrs. Svindland suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

WHEREFORE, plaintiffs Allison Svindland and Paul Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendant, Paul Kerins, jointly and severally with the other named defendants for compensatory and consequential damages and costs in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## COUNT VI – INFORMED CONSENT

## PLAINTIFFS V. WILLIAM I. NORWOOD, M.D., CHRISTIAN PIZARRO, M.D. & RUSSELL RAPHAELY, M.D.

130.    Paragraphs 1 through 129 are hereby incorporated by reference as though each were fully set forth herein.

131.   Mr. And Mrs. Svindland were never informed that the cooling
       strategy/perfusion/circulatory arrest procedures to be used on their son, Ian,
       were such that the risk of brain injury and organ damage was great.

132.   Mr. And Mrs. Svindland were never informed about the true nature of their
       son's cardiac anatomy, nor about the options available to Ian given that
       anatomy.  They were never given information regarding the widely varying
       success rates of the alternative procedures for cooling, perfusion and
       circulatory arrest, nor the surgical procedures, used by Defendants as
       compared to standard procedures used by other specialists and hospitals for
       treating Ian's cardiac condition.

133.   The surgical procedures and cooling strategy/perfusion/circulatory arrest
       procedures represent material information which parents on behalf of their
       child who was to undergo major open heart surgery, would have wanted to
       know in order to make an informed decision about the surgery.  Given that
       heart surgery with body cooling and circulatory arrest is a highly specialized
       procedure, any deviation from the standard procedures (for which morbidity
       and mortality numbers are generally available) constitutes a material risk
       about which the consenting individual must know in order to make an
       informed decision.

134.   Had Mr. And Mrs. Svindland been told about the surgical procedures and the
       mortality rate, and the cooling strategy/perfusion/circulatory arrest procedure
       and its ramifications, they would not have consented to the surgery and would

have had Ian transferred to another facility capable of performing these procedures safely and within the standard of care.

135. Due to Mr. And Mrs. Svindland's lack of information as to a material aspect of Ian's surgery, Ian was injured, suffered great pain and died.

136. By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, William Norwood, M.D, Christian Pizarro, M.D. and Russell Raphaely, M.D., in failing to inform Mr. And Mrs. Svindland of the material risks to the procedures they were about to perform, Ian Svindland was injured, suffered greatly and died.

137. By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, William Norwood, M.D, Christian Pizarro, M.D. and Russell Raphaely, M.D., in failing to inform Mr. And Mrs. Svindland of the material risks to the procedures they were about to perform, the Svindlands suffered the loss of their child.

138. As a further result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct, of defendants, William Norwood, M.D, Christian Pizarro, M.D. and Russell Raphaely, M.D., resulting in and contributing to the death of baby, Ian Svindland, Mr. and Mrs. Svindland suffered mental anguish and the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son, Ian Svindland, during the remainder of his natural

life.  In addition, the Svindlands have incurred expenses associated with the surgeries and cardiopulmonary bypass/perfusion/cooling and subsequent management of Ian Svindland.

139.   In addition, by reason of, and as a result of the aforesaid incidents, and the negligence and  carelessness as well as the reckless, willful and wanton conduct of defendants, William Norwood, M.D, Christian Pizarro, M.D. and Russell Raphaely, M.D., directly resulting in and contributing to the untimely death of baby Ian Svindland, the Svindlands suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

140.   Plaintiffs Paul Svindland and Allison Svindland, justifiably relied to their detriment upon the expertise defendants, William Norwood, M.D, Christian Pizarro, M.D. and Russell Raphaely, M.D., and relied upon them and each of them to inform them of the material risks to the procedure to be performed on Ian.

WHEREFORE, plaintiffs Paul Svindland and Allison Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendants, William Norwood, M.D, Christian Pizarro, M.D. and Russell Raphaely, M.D., jointly and severally with the other named defendants for compensatory and consequential damages and costs as well as for punitive damages in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## COUNT VII – WRONGFUL DEATH/SURVIVAL

## PLAINTIFFS V. DuPont Hospital, THE NEMOURS FOUNDATION AND

## WILLIAM I. NORWOOD, M.D., Ph.D. & CHRISTIAN PIZARRO, M.D. &

## RUSSELL RAPHAELY, M.D.

## VIOLATIONS OF THE REHABILITATION ACT

141.   Paragraphs 1 through 140 are hereby incorporated by reference as though each
       were fully set forth at length herein.

142.   The children, including Ian Svindland, admitted to the Nemours Cardiac
       Center of the DuPont Hospital, were handicapped under the definitions
       provided pursuant to the Rehabilitation Act, 29 U.S.C.S 701, et seq., and the
       Americans with Disabilities Act, 42 U.S.C.S. 12182, et seq., and all applicable
       federal regulations.

143.   The DuPont Hospital and the Nemours Cardiac Center, receive federal funds
       in the form of Hill-Burton Funds, Medicare and Medicaid payments, among
       others.  Furthermore, Hospitals are places of public accommodation under the
       ADA, 28 C.F.R. 36.104.

144.   Dr. Norwood, Dr. Pizarro, and Dr. Raphaely maintain offices in the Hospital
       and see patients there.  These offices are owned and maintained by the
       Hospital and the Foundation.  These physicians received federal funds as
       aforesaid.

145.   Ian Svindland had a congenital heart defect which substantially limited one or
       more of his major life activities and it was well known to his caregivers that
       this was the case.  He was otherwise qualified to be admitted to the DuPont

Hospital, but was diverted to the Cardiac Center and its staff (which was not shared with the rest of the Hospital).

146.   Ian through his parents, sought surgical and the accompanying anesthesia and perfusion services from the Nemours Cardiac Center of the DuPont Hospital and Dr. Norwood, and he was excluded from the appropriate services which he and his parents sought, solely based upon his handicap.

147.   No children in the rest of the DuPont Hospital, most of whom had some kind of handicap as defined by the Rehabilitation Act, were treated in the manner in which Ian and other children at the Nemours Cardiac Center were treated.

148.   No other children in the hospital receiving anesthesia, surgical and perfusion services were subjected to the anesthesia/perfusion/cooling and surgical techniques which were used in the Cardiac Center and by Dr. Norwood and the other defendants.

149.   Dr. Raphaely was not part of the Department of Anesthesiology which encompasses every other anesthesiologist at the Hospital.  Dr. Raphaely's only loyalty and only obligation was to the Cardiac Center.

150.   Dr. Norwood and Dr. Pizarro were not part of the Department of Surgery which encompasses every other surgeon in the Hospital.  Dr. Norwood's and Dr. Pizarro's only loyalty and only obligation were to the Cardiac Center.

151.   Dr. Norwood and his Cardiac Center staff did not attend or report to the Medical Board, the Peer Review Committee, or any other hospital committee or group, even those designed to improve patient care.  At all times material hereto, the hospital was aware of this lack of participation and never required

same from any of the defendants or any staff from the cardiac center, despite requiring this participation from all other departments of the hospital.

152.  This lack of participation, with the knowledge and blessing of the Hospital and Nemours Foundation caused children admitted to the cardiac center to be segregated and subjected to lesser standards of care than children being treated in all other areas of the hospital – solely based on the fact that they had a heart defect instead of some other type of defect which would have protected them from this total lack of oversight, control and care.

153.  Under Delaware law, the Hospital had a duty to protect patients from dangers flowing from negligent care by

    a.  assuring that only competent staff were granted privileges;

    b.  that only competent staff retained privileges;

    c.  that rules and regulations for patient safety were in effect and followed; and

    d.  that medical care provided within the walls of the hospital was adequately monitored.

154.  DuPont Hospital and Nemours Foundation conspired with all other named defendants in this action to assure that Ian was not provided with any protection from danger as was provided to other patients admitted to the hospital who were afforded the benefit of the hospital performing the protective duties described in the preceding paragraph.

155.  Ian Svindland was denied the protections described in paragraph 153 solely because of his handicap.

156.    Ian was deprived so that the Hospital could maximize profits by accommodating Dr. Norwood with autonomy to operate the Cardiac Center without any hospital monitoring.

157.    At all times material hereto, the Hospital and the Foundation knew or in the exercise of reasonable diligence should have known that the surgical, anesthesia/perfusion/bypass/cooling techniques utilized at the Cardiac Center were discriminatory and negligent.

158.    The anesthesia/cooling/perfusion procedures used with the children at the Cardiac Center were not done in accordance with the standards in the department of anesthesiology.  The Cardiac Center's anesthesiologists were not a part of the Department of Anesthesiology.  These anesthesiologists were under the umbrella of the Cardiac Center, Dr. Raphaely and Dr. Norwood, all of whom should have been supervised and their actions overseen by the Hospital and the Foundation.

159.    There would have been no accommodation necessary and no undue burden would have resulted  in order to allow these children, including Ian Svindland, who were admitted to the Cardiac Center, to have adequate and non-harmful surgical and anesthesia/perfusion/cooling services.  Any changes to technique or practice would not have been onerous especially to a program/strategy/practice which even the Delaware Department of Health found deficient.

160.    In the delivery of anesthesia and surgical services, and all that this entails, the children, including Ian Svindland, were discriminated against on the basis of

their handicap, and this discrimination prevented them from receiving care which was appropriate and which was not harmful.  Had these children, including Ian Svindland, not been admitted to the Nemours Cardiac Center as it was set-up and run, they would not have received the type of anesthesia and surgical care which they received, and they would not have suffered the dire consequences which they did suffer, including pain, suffering and death.

161.   Because of the discrimination suffered by Ian Svindland, he was denied adequate anesthesia and surgical services and because of this, he suffered severe pain and he died.

162.   At no time during Ian's hospitalization at the Cardiac Center of DuPont Hospital was consent from his parents sought whereby they were informed of the options for surgery, anesthesia care and/or perfusion practices on cardiopulmonary bypass and circulatory arrest.  The practice chosen was preordained due in large part to the discriminatory set-up of the entire program.

163.   The decisions made by Dr. Norwood, Dr. Pizarro and Dr. Raphaely, and permitted by the Hospital and the Foundation, violated the Rehabilitation Act in that they caused Ian Svindland to be treated differently and to be discriminated against based solely on his handicap, and prevented him from receiving appropriate care and services for which he was otherwise qualified to receive.  The entire Cardiac Center, with the blessings of and under the oversight of the Hospital and the Foundation was designed in such a manner that such discrimination was inevitable.

164.   Moreover, Dr. Norwood, Dr. Pizarro and Dr. Raphaely purposefully discriminated against Ian and other children like him based on their disability because they overtly chose to use a surgical and anesthesia/perfusion/cooling strategy which they knew or should have known to be below the standard of care, and then overtly and purposefully failed to document this fact as well as the results of this strategy and practice.

165.   The Delaware State Health Department's investigation found the Cardiac Center's surgery and anesthesia/cooling and perfusion practices different from other high-risk procedures in the rest of the hospital. In addition, no policies and procedures were in place for the use of anesthesia and perfusion in the cardiac center.

166.   It was unlawful for these defendants to provide Ian Svindland, as a qualified handicapped person under the ADA and Rehabilitation Act, with benefits or services that are not as effective as the benefits or services provided to others.

167.   By reason and as a result of the actions and inactions of Dr. Norwood, Dr. Raphaely, Dr. Pizarro, the DuPont Hospital and the Nemours Foundation, Ian Svindland suffered pain and lost his life; his parents suffered the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son, Ian Svindland, during the remainder of his natural life. In addition, Mr. And Mrs. Svindland have incurred expenses associated with the surgeries and cardiopulmonary bypass and subsequent management of Ian Svindland. Ian Svindland lost his life, but not before suffering terribly, and he lost the ability to enjoy his

natural life and earn a living.  In addition, the Plaintiffs incurred the cost of the hospitalization and burial.

168.     By reason and as result of the actions and inactions of Dr. Norwood, Dr. Raphaely, Dr. Pizarro, the DuPont Hospital and the Nemours Foundation, Mr. And Mrs. Svindland have incurred attorneys' fees and costs associated with investigating and bringing this claim.

WHEREFORE, Plaintiffs demand judgment against Defendants, DuPont Hospital, the Nemours Foundation, Dr. William Norwood, Dr. Christian Pizarro and Dr. Russell Raphaely for consequential and compensatory damages, including attorney's fees and costs, as permitted by statute.


**COUNT VIII – SURVIVAL ACTION**

**PLAINTIFFS V. DuPONT HOSPITAL and THE NEMOURS FOUNDATION**

**NEGLIGENT SUPERVISION, MONITORING, AND RETENTION OF HEALTH CARE PROVIDERS**

169.     Paragraphs 1 through 168 are hereby incorporated by reference as though each were fully set forth herein.

170.     Plaintiffs bring this action pursuant to the Delaware Survival Act and the provisions thereof.

171.     All the medical professional defendants named herein, perfusionists, and the nurses, advanced practice nurses, physician assistants and technicians at DuPont Hospital who cared for and were responsible for the treatment of plaintiff Ian Svindland, were the duly appointed agents, ostensible agents,

servants and/or employees of DuPont Hospital, were acting within the scope of their agency and/or employment,  and  either worked in, operated out of, and/or had privileges at A.I. DuPont/Nemours' facilities.

172.   Defendant DuPont Hospital and the Nemours Foundation had a duty under the law of corporate negligence to ensure the safety of Ian Svindland while he was a patient within the walls of DuPont Hospital.

173.   DuPont Hospital and the Nemours Foundation had a duty under the corporate negligence doctrine to ensure, among other duties,  that all persons practicing medicine within its walls who attended to the care and treatment of Ian Svindland complied with the prevailing standard of care in their care and treatment of Ian.

174.   Under Delaware law, the Hospital had a duty to protect patients from dangers flowing from negligent care by

   a.      assuring that only competent staff were granted privileges;

   b.      that only competent staff retained privileges;

   c.      that rules and regulations for patient safety were in effect and followed; and

   d.      that medical care provided within the walls of the hospital was adequately monitored.

175.   DuPont Hospital and the Nemours Foundation itself, carelessly and negligently breached its duty to Ian Svindland by failing to conform to the standard of care required of a hospital acting in the same or similar circumstances.

176.  DuPont Hospital and the Nemours Foundation failed to act on their knowledge of the impairment of the chief of cardiothoracic surgery, Dr. William Norwood, both before and after he was hired.

177.  DuPont Hospital and the Nemours Foundation failed to remove William Norwood, M.D. from the active practice of surgery at the Hospital as a result of his impairment, as well as for his failure to follow accepted standards of care on a regular, habitual and continual basis.

178.  DuPont Hospital and the Nemours Foundation hired and retained others who helped to cover up Dr. Norwood's impairment and negligence, with the knowledge of DuPont Hospital and Nemours Foundation.

179.  DuPont Hospital and the Nemours Foundation failed to require that all persons making notes in the chart actually enter truthful and accurate notes.

180.  DuPont Hospital and the Nemours Foundation failed to take steps to assure that all federal regulations with regard to patient care were being followed by the Cardiac Center and the named defendants herein.

181.  DuPont Hospital and the Nemours Foundation itself, carelessly and negligently breached its duty to Ian Svindland for failing to adequately supervise, monitor, hire, and retain only competent employees, servants, agents,  and/or ostensible agents.

182.  By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, DuPont Hospital and the Nemours Foundation, its employees, servants, agents, and/or ostensible agents, Ian Svindland's surgery, his perfusion and

cardiopulmonary bypass, including circulatory arrest, as well as his medical and subsequent surgical care were improperly managed, resulting in the preventable pain and suffering and death of baby Ian Svindland.

183.   By reason of and as a result of the aforesaid carelessness and/or negligence as well as the reckless, wanton and willful conduct of defendants, DuPont Hospital and the Nemours Foundation, their employees, servants, agents, and/or ostensible agents, acting by and through their employees, servants, agents, and/or ostensible agents, Paul Svindland and Allison Svindland suffered the loss of their child.

184.   By reason of and as a result of the aforesaid carelessness and/or negligence as well as the reckless, wanton and willful conduct of defendants, DuPont Hospital and the Nemours Foundation, its employees, servants, agents, and/or ostensible agents, acting by and through their employees, servants, agents, and/or ostensible agents, Ian Svindland suffered horribly before his death.

185.   As a further result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct, of DuPont Hospital and the Nemours Foundation, its employees, servants, agents, and/or ostensible agents, resulting in the pain, suffering and death of baby Ian Svindland, Mr. And Mrs. Svindland suffered the losses of comfort, aid, assistance, services, counseling, guidance, solace and financial contribution that they would have received from their son, Ian Svindland, during the remainder of his natural life.  In addition, Mr. And Mrs. Svindland have incurred medical expenses associated with the surgeries and cardiopulmonary bypass and subsequent management

of Ian Svindland. Plaintiffs, Paul Svindland and Allison Svindland, are entitled to recover for the decedent Ian Svindland's conscious pain and suffering, loss of earning capacity  and any other pecuniary losses which the decedent sustained as a result of his preventable, and untimely death.

186.   In addition, by reason of, and as a result of the aforesaid incidents, and the negligence and  carelessness as well as the reckless, willful and wanton conduct of defendant, Dr. Norwood, directly resulting in and contributing to the untimely death of baby Ian Svindland, Mr. And Mrs. Svindland suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

WHEREFORE, plaintiffs Paul Svindland and Allison Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendant DuPont Hospital and the Nemours Foundation, jointly and severally with the other named defendants for compensatory and consequential damages and costs as well as for punitive damages in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

**COUNT IX – SURVIVAL ACTION**

**PLAINTIFFS V. WILLIAM I. NORWOOD, M.D. &**

**CHRISTIAN PIZARRO, M.D.**

**NEGLIGENCE**

187.   Paragraphs 1 through 186 are hereby incorporated by reference as though each were fully set forth herein.

188.   Plaintiffs bring this action pursuant to the Delaware Survival statute and its provisions and law.

189.   At all times material hereto, Dr. Norwood and Dr. Pizarro were employed by and/or was the agent and/or ostensible agent of the DuPont Hospital, as well as the Nemours Foundation, as a physician and cardiothoracic surgeon.  He was chief and director of the Nemours Cardiac Center of DuPont Hospital.

190.   At all times material hereto, Dr. Norwood was an impaired physician who should not have been performing surgery.

191.   Upon information and belief, Dr. Norwood was not able to effectively and properly perform surgery because he was impaired.

192.   At all times material hereto, Dr. Norwood employed a "cooling strategy" on cardiopulmonary bypass and for circulatory arrest which was below the standard of care.  At all times material hereto, Dr. Pizarro either partially directed this process or took part in this process.

193. In addition, Dr. Norwood failed to meet the standard of care with regard to Ian's surgery on June 25, 2003 by failing to perform the appropriate surgery, and failing to perform the surgery which was done in a competent and proper manner.

194. Dr. Pizarro failed to meet the standard of care with regard to Ian's surgery on June 25, 2003 by failing to perform the appropriate surgery, and failing to perform the surgery which was done in a competent and proper manner.

195. In addition, Dr. Norwood and/or Dr. Pizarro failed to ligate Ian's patent ductus arteriosus.

196. At the time that Dr. Norwood and Dr. Pizarro performed the surgeries on Ian Svindland, including directing the cooling process, they were well aware that his "cooling strategy" was dangerous and did not offer adequate protection to the brain and other organs of the body, and that it entailed a great risk to the patient's well-being.

197. By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendants, Dr. Norwood and Dr. Pizarro, Ian Svindland's surgery, his perfusion and cardiopulmonary bypass, including circulatory arrest, as well as his medical and subsequent surgical care were improperly managed, resulting in the preventable pain and suffering and death of baby Ian Svindland.

198. Plaintiffs, Paul Svindland and Allison Svindland are entitled to recover for the decedent Ian Svindland's conscious pain and suffering, loss of earning

capacity  and any other pecuniary losses which the decedent sustained as a result of his preventable, and untimely death.

199.    In addition, by reason of, and as a result of the aforesaid incidents, and the negligence and  carelessness as well as the reckless, willful and wanton conduct of defendants, Dr. Norwood and Dr. Pizarro, directly resulting in and contributing to the untimely death of baby Ian Svindland, Mr. And Mrs. Svindland suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

WHEREFORE, plaintiffs Paul Svindland and Allison Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendant, William I. Norwood, M.D., Ph.D. and Christian Pizarro, M.D., jointly and severally with the other named defendants for compensatory and consequential damages and costs as well as for punitive damages in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).


**COUNT X –SURVIVAL**

**PLAINTIFFS V. WILLIAM NORWOOD, M.D., PhD.**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

200.    Paragraphs 1 through 199 are hereby incorporated by reference as though each were fully set forth herein.

201.    Due to all of the aforementioned facts and allegations, Mr. And Mrs. Svindland suffered emotionally from the care Ian  received at the Hospital

under the care of the defendants which caused him to require medical treatment.

202.    Mr. And Mrs. Svindland had no reason to believe until they obtained Ian's medical records and had them reviewed, that Ian had died at the hands of the Defendant, William Norwood, among others.  They were not told the true reason for Ian's death, but were purposefully misled by Dr. Norwood and others into believing that Ian was "very sick" and that his condition was "one of those things."  The distress caused by this information and the knowledge that the true nature of Ian's condition was overtly kept from them caused them severe emotional distress which has manifested itself in serious physical ailments.

203.    In addition, by reason of, and as a result of the aforesaid incidents, and the negligence and  carelessness as well as the reckless, willful and wanton conduct of defendant, Dr. Norwood, directly resulting in and contributing to the untimely death of baby Ian Svindland, Mr. And Mrs. Svindland suffered severe emotional distress, and serious injuries to their nerves and other parts of their bodies.

**204.**    Mr. And Mrs. Svindland have suffered long-continuing physical manifestations of this emotional distress.

WHEREFORE, plaintiffs, Paul Svindland and Allison Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendants, William I. Norwood, M.D., Ph.D., jointly and severally with the other named defendants for compensatory and consequential damages and costs

as well as for punitive damages in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).

## COUNT XI – SURVIVAL

## PLAINTIFFS V. PAUL KERINS, PERFUSIONIST

## NEGLIGENCE

205.   Paragraphs 1 through 204 are hereby incorporated by reference as though each were fully set forth at length herein.

206.   Plaintiffs bring this action in accordance with the Delaware Survival Statute and its provisions.

207.   At all times material hereto, Paul Kerins was an employee and/or agent and/or ostensible agent of the DuPont Hospital, as well as the Nemours Foundation, as a perfusionist in the Department of Cardiac Anesthesia of the Nemours Cardiac Center of DuPont Hospital.

208.   At all times material hereto, Mr. Kerins employed a "cooling strategy" on cardiopulmonary bypass and for circulatory arrest which was well below the standard of care.

209.   At the time that the surgeries were performed on Ian Svindland, he was well aware that the "cooling strategy" was dangerous and did not offer adequate protection to the brain and other organs of the body, and that it entailed a great risk to the patient's well-being.

210.   By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendant,

Paul Kerins, Ian Svindland's perfusion and cardiopulmonary bypass, including circulatory arrest, were improperly managed and implemented, resulting in the preventable pain and suffering and death of baby Ian Svindland.

211.    By reason of, and as a result of the aforesaid incidents, and the negligence and carelessness as well as the reckless, willful and wanton conduct of defendant, P. Kerins, the Svindlands suffered the loss of their child.

212.    As a further result of the carelessness and/or negligence as well as the reckless, wanton and willful conduct of defendant, Paul Kerins, resulting in and contributing to the death of baby Ian Svindland, Mr. And Mrs. Svindland have incurred expenses associated with the surgeries and cardiopulmonary bypass and subsequent management of Ian Svindland.

213.    Plaintiffs Paul Svindland and Allison Svindland are entitled to recover for the decedent Ian Svindland's conscious pain and suffering, loss of earning capacity  and any other pecuniary losses which the decedent sustained as a result of his preventable, and untimely death.

WHEREFORE, plaintiffs Paul Svindland and Allison Svindland, individually, and as Administrators of the Estate of baby Ian Svindland, demand judgment in their favor and against defendant, Paul Kerins, jointly and severally with the other named defendants for compensatory and consequential damages and costs as well as for punitive damages in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00).


## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all claims.

Respectfully submitted,

EATON & McCLELLAN

By:     Signature Validation Code TMB3393

__/s/ Theresa M. Blanco_____
Theresa M. Blanco, Esquire (ID #77468)

Dated: January 31, 2005